482 F.2d 1148
 AGRI-TECH, INC., a Missouri corporation, Petitioner,
v.
Elliot L. RICHARDSON, Secretary of Health, Education, and
Welfare, and Dr. Charles C. Edwards, Commissioner
of Food and Drugs, Respondents.
 No. 72-1252.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 10, 1973.
Decided Aug. 2, 1973.
Rehearing Denied Aug. 31, 1973.
 
 Kirkpatrick W. Dilling, Chicago, Ill., for petitioner.
 Howard S. Epstein, Asst. Chief, Consumer Affairs, Antitrust Div., Dept. of Justice, Washington, D. C., for respondents.
 Before MATTHES, Senior Circuit Judge, BRIGHT, Circuit Judge, and TALBOT SMITH, Senior District Judge.*
 MATTHES, Senior Circuit Judge.
 
 
 1
 Agri-Tech, Inc. has petitioned this court to review an order of the Secretary of Health, Education, and Welfare issued through the Commissioner of Food and Drugs on February 24, 1972, withdrawing approval of New Animal Drug Applications (NADA) Nos. 5-987V and 5-633V, respectively, concerning drugs containing "iodinated casein," or "Protamone," as the active ingredient.[1]
 
 
 2
 On January 10, 1973, we heard arguments, and the cause was taken under submission. Two days prior thereto, January 8, 1973, the Supreme Court had granted certiorari in Bentex Pharmaceuticals, Inc. v. Richardson, 463 F.2d 363 (4th Cir. 1972); CIBA Corp. v. Richardson, 463 F.2d 225 (3rd Cir. 1972); USV Pharmaceutical Corp. v. Richardson, 461 F.2d 223 (4th Cir. 1972); Hynson, Westcott & Dunning, Inc. v. Richardson, 461 F.2d 215 (4th Cir. 1972). Directly involved in those cases were the issues posed here. We therefore concluded to withhold our decision until opinions were forthcoming in the above cases. On June 18, 1973, opinions were filed by the Supreme Court and are reported sub nomine Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235; CIBA Corp. v. Weinberger, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230; USV Pharmaceutical Corporation v. Weinberger, 412 U. S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244; Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207. Our judgment to delay decision has been vindicated. The Supreme Court opinions, in our view, are dispositive of petitioner's challenge to the withdrawal order.
 
 I. STATUTORY HISTORY AND SCHEME
 
 3
 The statutory history and regulatory scheme are discussed and considered in Weinberger v. Hynson, etc., supra (hereinafter referred to as Hynson). Therefore, another full recitation of the applicable statutes and regulations is unnecessary. We will, however, discuss the pertinent provisions of the legislation in our consideration of the issues which petitioner continues to urge upon us.
 
 
 4
 By way of background, petitioner has for approximately 25 years distributed and sold in interstate commerce products for animal feeding purposes containing iodinated casein, also known as Protamone. For some years subsequent to 1945, animal applications of iodinated casein were the subject of new animal drug applications, specifically, NADAs Nos. 5-633V and 5-987V. The applications had been approved by the United States Food and Drug Administration.
 
 
 5
 In 1962, Congress amended the Food, Drug and Cosmetic Act to expand jurisdiction of the Commissioner of the Food and Drug Administration to allow review of "new drugs" for substantial evidence of both safety and effectiveness. Pub.L. 87-781, 76 Stat. 780. The provision applied equally to human and animal drugs until the amendments in 1968, Pub.L. 90-399, 82 Stat. 342, separated and recompiled the provisions relating to animal drugs. S.Rep.No.1308, 90th Cong., 2d Sess.; 1968 U.S.Code, Cong. and Adm.News, p. 2607 et seq. These separate provisions are, insofar as applicable here, nearly identical.
 
 
 6
 To effect the provisions of the 1962 amendment, particularly 21 U.S.C. Sec. 355(e), the FDA by notice in 31 Fed. Reg. 9426 on July 9, 1966, announced that the National Academy of Sciences-National Research Council (NAS-NRC) had agreed to assist the FDA in its review of claims of effectiveness for drugs that had been approved from 1938 until October, 1962. All holders of NDAs were directed to submit data to NAS-NRC in order to facilitate the determination whether there was ground for invoking Sec. 505(e) of the Act, and to provide each holder of an approved newdrug application an opportunity to present for the consideration of NAS-NRC the best data available to support the claims.
 
 
 7
 Petitioner responded to the notice by submitting data for each iodinated casein product on a "Drug Efficacy Study-Form Letter A." According to the data submitted on the forms, Protamone:
 
 
 8
 (1) Improves growth and feathering in turkeys, chickens, or ducks.
 
 
 9
 (2) Improves egg production and eggshell texture in laying hens and breeders.
 
 
 10
 (3) Diminishes carcass fat on ducks.
 
 
 11
 (4) Increases milk and butterfat production in goats, sheep, beef cattle, and dairy cattle.
 
 
 12
 (5) Increases rate of growth, fertility and libido in goats, sheep, swine, beef cattle and dairy cattle.
 
 
 13
 (6) Increases milk flow and weaning weights and decreases baby mortality in swine.
 
 
 14
 In support of these claims petitioner submitted with these Forms A various citations to and reprints of studies allegedly evidencing the claims of effectiveness. The NRC then reviewed these data, and revealed its detailed reasoning on Forms B-1, which appear as a part of the official record filed in the office of the clerk of this court, but not in the Appendix. Apparently, petitioner never received the Forms B-1, but only the Forms B-2, which contain only the NRC's ultimate findings, and the FDA Notice of Hearing, 36 Fed.Reg. 17367, infra, which summarized these findings. We shall review seriatim the supporting data and NRC B-2 conclusions which were given to petitioner.
 
 
 15
 To support its claim that Protamone improves growth and feathering in turkeys, petitioner submitted only an article cited at 27 Poultry Sci. 670 (1948) entitled "The effect of iodinated casein on moulting turkeys." The conclusion of the NRC as to this claim was "not effective." Under explanatory statements it said: "Induces moulting; no data on growth and feathering." (Emphasis supplied.)
 
 
 16
 To support its claims that Protamone improves egg production and texture, and growth and feathering in chickens, petitioner cited 33 articles. The Form B-2 from the NRC said "not effective. No data to substantiate claims."
 
 
 17
 To support its claims that Protamone improves growth and feathering and decreases carcass fat in ducks, petitioner cited four articles. The B-2 form from the NRC said "effective," but said the label's "[c]laims should state 'increases daily gain' instead of 'improving growth and feathering."'
 
 
 18
 To support its claim that Protamone increases milk and butterfat production, growth, fertility and libido in goats and sheep, petitioner cited 14 published articles, attached two unpublished articles and a letter of endorsement from a corporate farm as to goats; as to sheep it cited 24 published articles and attached two unpublished articles. The Forms B-2 from the NRC evaluated iodinated casein as to both goats and sheep as follows:
 
 
 19
 "a. Milk production-probably effective
 
 
 20
 b. Rate of growth-probably not effective (more information needed)
 
 
 21
 c. Fertility and libido-probably not effective (more information needed)."
 
 
 22
 According to the NRC, "Categories b and c above must have more information before further consideration can be given."
 
 
 23
 To support the claims Protamone increases milk flow and weaning weights, reduces baby mortality and improves growth, market finish, fertility and libido in swine, petitioner cited 28 articles and attached two articles. The NRC said on the Form B-2, "not effective. Claims on milk flow: not adequately substantiated. Rate of growth or breeding performance: no adequate evidence."
 
 
 24
 Supporting its claims that Protamone increases milk and butterfat production, growth, fertility and libido in beef and dairly cattle, petitioner cited nine articles as to beef cattle and as to dairy cattle apparently cited 81 articles, plus attaching nine articles and various letters, advertisements and news items. As to both beef and dairy cattle, the NRC reported on the B-2 forms the following evaluation:
 
 
 25
 "a. Rate of gain-probably not effective
 
 
 26
 -more information needed
 
 
 27
 b. Libido and fertility-probably effective
 
 
 28
 -for bulls only
 
 
 29
 -more information needed
 
 
 30
 c. Milk production-Probably effective
 
 
 31
 Qualification on label-'effective for limited periods of time'
 
 
 32
 -'effect limited to declining phase of lactation'
 
 
 33
 -'must be accompanied with increased feed intake'
 
 
 34
 -'may increase heat sensitivity of animal."'
 
 
 35
 Following this NRC evaluation of the data submitted by petitioner, the Commissioner published on October 8, 1970, at 35 Fed.Reg. 15859 his findings based upon the NRC evaluation. They were:
 
 
 36
 "1. Iodinated casein is effective for increasing daily gain in growing ducks and increasing milk production in dairy cows.
 
 
 37
 2. Information provided does not contain substantial evidence of effectiveness of iodinated casein for improving fertility in bulls; increasing milk production in goats, beef cows, and sheep; in improving fertility in boars, goats, and sheep; and for improving rate of gain in dairy cattle, sheep and goats.
 
 
 38
 3. Iodinated casein is not effective for improving growth and feathering in turkeys and chickens; increasing milk flow in nursing sows; or improving egg production and eggshell texture in chickens."
 
 
 39
 As to the uses found effective, the NRC and FDA found the label should qualify the claims by informing the user as follows:
 
 
 40
 "1. The claim for increased milk production in dairy cows should be qualified as follows: (a) Effective for limited periods of time, (b) effectiveness is limited to the declining phase of lactation, (c) administration must be accompanied with increased feed intake, and (d) may increase heat sensitivity of the animal.
 
 
 41
 2. The claim for improving growth and feathering in growing ducks should state 'increases daily gain'."
 
 
 42
 This order gave petitioner six months in which to alter its labeling to conform to these findings or submit additional evidence of efficacy. Petitioner did neither. Instead, its technical counsel wrote the FDA on March 22 and April 13, 1971, requesting the Forms B-1 of the NRC studies.
 
 
 43
 Upon expiration of the six months, the Commissioner entered a Notice in the Federal Register, 36 Fed.Reg. 17367 (Aug. 28, 1971), proposing to withdraw petitioner's NADAs for iodinated casein pursuant to Sec. 512 of the Act, 21 U.S.C. Sec. 360b(e), on the grounds that there was a lack of substantial evidence of its effectiveness for its labeled purposes. This notice, after referring to the prior announcement in 35 Fed.Reg. 15859, stated:
 
 
 44
 "Therefore, notice is given to AgriTech, Inc., . . . and to any interested person who may be adversely affected that the Commissioner of Food and Drugs proposes to issue an order under the provisions of section 512(e) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360b(e)) withdrawing approval of NADA No. 5-633V, NADA No. 5-987V, . . . and all amendments and supplements thereto. This action is proposed on the grounds that there is a lack of substantial evidence that the drugs have the effect they purport or are represented to have under the conditions of use prescribed, recommended, or suggested in their labeling.
 
 
 45
 In accordance with the provisions of section 512 of the act (21 U.S.C. 360b), the Commissioner will give the applicant and any other interested person who would be adversely affected by an order withdrawing such approval an opportunity for a hearing at which time such persons may produce evidence and arguments to show why approval of said new animal drug applications should not be withdrawn.
 
 
 
 * * *
 Within 30 days after publication hereof in the FEDERAL REGISTER, such persons are required to file with the Hearing Clerk, Department of Health, Education and Welfare, Office of the General Counsel, Room 6-62, 5600 Fishers Lane, Rockville, Md. 20852, a written appearance electing whether:
 
 
 [1]
 To avail themselves of the opportunity for a hearing; or
 
 
 [2]
 Not to avail themselves of the opportunity for a hearing
 
 
 
 46
 * * *
 
 
 47
 If such persons elect to avail themselves of the opportunity for a hearing, they must file a written appearance requesting the hearing and giving the reasons why approval of the new animal drug application should not be withdrawn together with a well-organized and full-factual analysis of the clinical and other investigational data they are prepared to prove in support of their opposition to the grounds for this notice. A request for a hearing may not rest upon mere allegations or denials but must set forth specific facts showing a genuine and substantial issue of fact that requires a hearing."
 
 
 48
 Subsequently, petitioner filed an Appearance and Request for Hearing, but did not file the requisite "well-organized and full-factual analysis of the clinical and other investigational data they [were] prepared to" present at the demanded hearing.
 
 
 49
 Instead, petitioner's request for a hearing and a subsequent letter declared it sought to prove at that hearing (1) that Protamone is generally recognized as effective, is therefore not a new animal drug, and thus is exempt from the statute; (2) that pre-1962 letters from the FDA certify Protamone is not a new drug; (3) that the FDA order withdrawing such pre-1962 letter opinions is invalid and/or inapplicable; (4) that the withdrawal procedure is defective because (a) there was no "new information" before the Commissioner to warrant activation of the withdrawal procedure, (b) the failure to reveal fully the NRC's findings (i.e., the B-1 forms) violates due process; (c) the NRC study itself found Protamone effective for some uses; and (d) there were no NRC reports on petitioner's other thyro-protein products, Mom Sow Milking Tablets and Stimulac Pellets.
 
 
 50
 Thus, petitioner offered to reveal at the hearing no clinical evidence, but rather demanded an evidentiary hearing on the foregoing questions of law and demanded access to the B-1 forms of the NRC before such a hearing. Consequently, on March 4, 1972, the Commissioner published the order sub judice, 37 Fed.Reg. 4730, denying a hearing on the proposed withdrawal and withdrawing approval of petitioner's NADAs for iodinated casein products (Protamone, Stimulac Pellets, Mom Sow Milking Tablets), i.e., NADA No. 5-633V and No. 5-987V. That order has been stayed by this court pending disposition of this petition for review.
 
 
 51
 Although, as above stated, we believe the pronouncements by the Supreme Court in the four drug cases are dispositive of all attacks of petitioner against the withdrawal order, we nonetheless believe further explication of our views is necessary, particularly in view of petitioner's contention set forth in its supplemental brief. After the Supreme Court opinions had been filed, the parties, at our direction, filed supplemental briefs focused upon the holdings of the Supreme Court. The Commissioner in his brief submitted that the Supreme Court opinions are wholly dispositive of all of petitioner's contentions. On the other hand, petitioner disagrees and insists in its supplemental brief that all of the issues have not been resolved by the Supreme Court; specifically, petitioner urges that the due process issue was not decided.
 
 
 52
 From the outset of this controversy, petitioner has adamantly insisted that the data and material it submitted to the NRC for review on Forms A, above referred to, were sufficient to constitute compliance with the statutory requirements essential to prevent withdrawal of a new animal drug application. Thus, in response to the notice of opportunity for a hearing appearing in 36 Fed.Reg. 17367, above quoted verbatim in part, counsel for petitioner, in requesting a hearing, enumerated a number of reasons in support of the request for a hearing. The reasons are also delineated, supra.
 
 
 53
 But the undeniable fact is that at no time did petitioner adhere to the mandate of the statutes and the regulations promulgated by the Commissioner by filing a well-organized factual analysis of the clinical and other data that it was prepared to prove in support of its opposition to the withdrawal of its drugs. Petitioner endeavored to justify its non-compliance by postulating that the burden of proof rested upon the Commissioner to prove at an adversarial hearing the deficiencies in the data and material submitted in support of its drug-efficacy study forms "A". That is to say, petitioner argues that before it was required to submit any additional scientific data, it was entitled to a hearing at which the Commissioner was required to prove why the material submitted by petitioner did not constitute substantial evidence of the efficacy of its products. And, it also argued that it was entitled to a copy of the NRC B-1 reports and the names of the members of the panel constituting the reviewing board. But there is no case law to support petitioner's position. To the contrary, it has been held that in enacting the 1962 statute, Congress placed the burden of proving efficacy upon the manufacturer of the product. Ubiotica Corp. v. FDA, 427 F.2d 376, 378 (6th Cir. 1970); The Upjohn Co. v. Finch, 422 F.2d 944 (6th Cir. 1970). And that principle is implicit in Hynson, supra.
 
 
 54
 Furthermore, the Supreme Court, contrary to petitioner's contention, held that the regulatory scheme does afford an applicant due process:
 
 
 55
 "There can be no question that to prevail at a hearing an applicant must furnish evidence stemming from 'adequate and well-controlled investigations.' We cannot impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's 'pleadings' that it cannot succeed.
 
 
 56
 The NAS-NRS [sic] panels evaluated approximately 16,500 claims made on behalf of the 4,000 drugs marketed pursuant to effective NDAs in 1962. Seventy percent of these claims were found not to be supported by substantial evidence of effectiveness, and only 434 drugs were found effective for all their claimed uses. If the FDA were required automatically to hold a hearing for each product whose efficacy was questioned by the NAS-NRC study, even though many hearings would be an exercise in futility, we have no doubt that it could not fulfill its statutory mandate to remove from the market all those drugs which do not meet the effectiveness requirements of the Act."
 
 
 57
 Hynson, supra, 93 S.Ct. at 2478. (Emphasis supplied.)
 
 
 58
 We are fully cognizant that in Hynson, supra, the Supreme Court affirmed that part of the opinion of the Court of Appeals setting aside the order of the Commissioner for failure to provide the petitioner with an opportunity for a hearing. But the Hynson case is clearly distinguishable in that there the applicant complied with the newly promulgated regulations and submitted the material which it claimed constituted "substantial evidence of [the] effectiveness [of its drug]."
 
 
 59
 Although petitioner also argues that it is entitled to a hearing before the Commissioner on the question of whether or not its product constitutes a new animal drug within the meaning of the Act, we regard the Hynson case as dispositive of that issue. In Hynson, the Court held that if there is not "substantial evidence" of the drug's effectiveness, it cannot be considered generally recognized as effective. Hynson clearly holds that the initial determination whether a drug is a new animal drug is within the jurisdiction of the Commissioner and he may summarily deny a hearing on the issue whether a drug is "generally recognized" and therefore exempt from the withdrawal provisions if he finds there is no "substantial evidence" raising an issue of fact. "It also follows that if Hynson was not entitled to a hearing under Sec. 505(e) [21 U.S.C. Sec. 355(e)], it would not be entitled to a hearing on its claim that Lutrexin is not a 'new drug."' 93 S.Ct. at 2483.
 
 
 60
 In summary, we hold that petitioner failed to comply with the regulatory provisions for the withdrawal of approval of its NADAs and thus, it failed to fully exhaust its administrative remedies. We do not find any authority in this area of the law to sustain petitioner's contention that it was entitled as a matter of right to a hearing on the record that it filed for review by the NRC.
 
 
 61
 We further hold that there is no substance in petitioner's claim that the Commissioner lacked authority to withdraw its NADAs as to those products which had been found effective. The drug applications in question covered all of the products and, under the clear terms of the statute, when the petitioner failed to follow the prescribed procedures, the Commissioner was fully authorized to withdraw the approval of the NADAs in their entirety.
 
 
 62
 We therefore deny Agri-Tech's petition to review. Since it may desire to file a new animal drug application, or otherwise pursue the matter, and there being no claim that Protamone is unsafe, our stay heretofore granted will be continued in effect until the 15th day of September, 1973. See Pfizer, Inc. v. Richardson, 434 F.2d 536, 548 (2nd Cir. 1970).
 
 
 
 *
 Eastern District of Michigan, sitting by designation
 
 
 [1]
 The withdrawal order was published in 37 Fed.Reg. 4730 (March 4, 1972)