**PHARMANEX, INC., a Delaware corporation authorized to do business in the State of Utah, Plaintiff,**

v.

**Donna SHALALA, in her official capacity as Secretary of the United States Department of Health and Human Services, and Michael Friedman, in his official capacity as First Deputy Commissioner of the Food and Drug Administration, Defendants.**

No. 2:97 CV 0262 K.

United States District Court,
D. Utah,
Central Division.

Feb. 16, 1999.

Richard M. Hymas, Earl J. Peck, Nielsen & Senior, Salt Lake City, UT, Stuart M. Pape, Daniel A. Kracov, Patton Boggs & Blow, Washington, DC, Alan L. Sullivan, Robert W. Payne, Todd M. Shaughnessy, Snell & Wilmer LLP, Salt Lake City, UT, Richard M. Cooper, Helen I. Dooley, Williams & Connolly, Washington, DC, James S. Jardine, Rick B. Hoggard, Mr., Ray Quinney & Nebeker, Salt Lake City, UT, Brent M. Burningham, Marketstar Corp., Ogden, UT, for Pharmanex.

Bill Ryan, U.S. Attorney's Office, Jacqueline H. Eagle, U.S. Department of Justice, Washington, DC, Neal Parker, Food and Drug Administration, Rockville, MD, for Donna Shalala

Bill Ryan, U.S. Attorney's Office, U.S. Department of Justice, Washington, DC, for Michael Friedman.

Jacqueline H. Eagle, U.S. Department of Justice, Washington, DC, Neal Parker, Food and Drug Administration, Rockville, MD, for Food and Drug Administration.

Alan Charles Raul, Sidley & Austin, Washington, DC, for National Nutritional Foods, amicus.

Paul Wood, Littlefield & Peterson, Salt Lake City, UT, for National Organization For Rare Disorders, amicus.

## ORDER

KIMBALL, District Judge.

Plaintiff Pharmanex, Inc. ("Pharmanex") filed this case seeking judicial review of an administrative decision issued by the Food and Drug Administration ("FDA") on May 20, 1998 (the "FDA Decision"). In that decision, FDA ruled that Cholestin, a product marketed by Pharmanex, is a drug, rather than, as Pharmanex contends, a dietary supplement. Pharmanex seeks an order holding the FDA Decision unlawful under the Administrative Procedure Act ("APA"), *5 U.S.C. § 706(2)(A) and (C)*, a declaration that Cholestin is a dietary supplement and not a drug, and a permanent injunction prohibiting FDA from continuing to bar entry into the United States of red yeast rice by Pharmanex for use in the manufacture of Cholestin.

Before the Court are Pharmanex's Motion to Hold Unlawful and Set Aside FDA's Decision of May 20, 1998, and FDA's Motion to Affirm Administrative Decision.

### BACKGROUND

1. Statutory Overview.

This case requires interpretation of the Federal Food, Drug, and Cosmetic Act ("FDCA"), *21 U.S.C. § 301, et seq.*, as amended by the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), *Pub.L. No. 103–417, 108 Stat. 4325 (1994)*. Congress enacted DSHEA in recognition of the valuable role played by dietary supplements in improving health, preventing disease, and reducing health care costs. *Pub.L. No. 103–417(2), 108 Stat. 4325–26 (1994), 21 U.S.C. § 321 note (setting forth Congressional findings)*. Specifically, Congress acted to protect "the right of access of consumers to safe dietary supplements" and to remove "unreasonable regulatory barriers limiting or slowing the flow of safe products and accu-

rate information to consumers" that had been imposed by FDA. *Id.*

DSHEA fulfills that purpose by, among other things, defining dietary supplements, directing FDA that they are not to be regulated as drugs or food additives, and placing the burden on FDA to prove that a dietary supplement is unsafe before it can be removed from the marketplace.[1] *See S.Rep. No. 103–410, at 2 (1994).* The definition of dietary supplement added by DSHEA contains two inclusionary clauses and one exclusionary. *21 U.S.C. § 321(ff).* The two inclusionary clauses are not at issue in this suit. These clauses include within the definition products that are intended to supplement the diet by increasing total dietary intake, that contain an ingredient such as a vitamin, mineral, herb, or amino acid, and that are intended for ingestion in a tablet, capsule, powder, softgel, or form other than conventional food. *21 U.S.C. § 321(ff)(1) and (2).* FDA does not dispute that Cholestin satisfies the requirements of these clauses.

The exclusionary clause, which is at issue in this case, is itself composed of two clauses. The first is the so-called prior market clause, which provides that the definition of dietary supplement does include "an article that is approved as a new drug under section 355 [that] was, prior to such approval, certification, or license, marketed as a dietary supplement or as a food" unless FDA has issued a regulation finding that the article as used as or in the dietary supplement constitutes adulterated food, which is defined and made unlawful in another section of the FDCA. *21 U.S.C. § 321(ff)(3)(A).* The second clause provides that the definition does not include "an article that is approved as a new drug under section 355" that was not, before such approval, marketed as a dietary supplement.[2] *21 U.S.C. § 321(ff)(3)(B).*

The Senate Committee on Labor and Human Resources explained the origin and purpose of the exclusionary clause as follows:

The committee intends that the FDA should regulate dietary supplements as food and not as drugs, including dietary supplements that provide information about their nutritional impact on the structure or function of the human body. [DSHEA's definition of dietary supplement] is intended to make the point unequivocally clear for the future.

On occasion, a substance that is properly included as a dietary ingredient in a dietary supplement (food) product may also function as an active ingredient in a drug product. There is nothing particularly surprising about this fact.

As an example, the dietary substance L-carnitine may properly be used as an ingredient in a dietary supplement (as FDA itself has acknowledged), although it is also the active ingredient in a drug product that has been approved by FDA for a particular prescription-only usage. Similarly, the substance caffeine is a natural component of food products such as coffee and tea; it is used as an added ingredient in other foods, including carbonated beverages, and it has also been approved by FDA as a drug ingredient.

In general, it is the intended use of a particular finished product (as shown by representations made for it in promotional materials) that determines whether tha[t] product and its ingredients are subject to regulation as a food or as a drug. If a vitamin product or an herbal product, for example, is represented for use as a "dietary supplement," it is a food; if it is represented to cure, mitigate, treat, or prevent disease, it is a drug.

1. DSHEA also includes special safety requirements for dietary supplements (*21 U.S.C. § 342(f)*), special provisions to ensure adequate and truthful labeling (*21 U.S.C. §§ 343(s), 343(q)(5)(F)*), provisions expressly permitting the labeling of dietary supplements to characterize the percentage level of a dietary ingredient for which FDA has not established a reference daily intake, daily recommended value, or other recommendation for daily consumption (*21 U.S.C. § 343(r)(2)(F)*), provisions authorizing FDA to establish good-manufacturing practice require-

ments for dietary supplements (*21 U.S.C. § 342(g)*), and provisions permitting the labeling of dietary supplements to set forth statements of nutritional support, including statements that describe the role of a nutrient or dietary ingredient intended to affect the structure or function of the human body (*21 U.S.C. § 343(r)(6)*).

2. This clause also provides that the definition does not include an article authorized for investigation as a new drug. That provision is not relevant to this case.

During consideration of [DSHEA], concerns were expressed that manufacturers or importers of drugs could avoid the drug approval process by marketing drug products as dietary supplements. Although current authorities should be adequate to deal with such potential problems, the committee is sensitive to those concerns. Accordingly, Senators Harkin and Hatch agreed to formulate additional language prior to consideration of [DSHEA] in the Senate.

Under the substitute to [DSHEA] as approved by committee, a substance which has been marketed as a dietary ingredient in a dietary supplement, or otherwise as a food, does not lose its status as a food (assuming it is intended for use as a dietary supplement or other food purpose as shown by its promotional materials) just because FDA approves the substance for use as an active ingredient in a new drug, certifies a finished product containing the substance as an antibiotic, or licenses a finished product containing the substance as a biologic. Those types of products would be drugs because they would be promoted with drug claims. They would, and should, have no effect on the food status of a properly-labeled dietary supplement. For example, if ever FDA should eventually approve Vitamin C as a drug to treat cancer, Vitamin C properly would also continue to be available as a dietary supplement (food) product, so long as it is promoted as a dietary supplement without disease prevention claims.

*S.Rep. No. 103–410, at 20–21 (1994).*

### 2. Plaintiff's Product Cholestin.

Cholestin is a capsule consisting solely of milled red yeast rice, a traditional food that has been eaten and valued for its health benefits in China and elsewhere in East Asia for centuries and in the United States for decades. Pharmanex began marketing Cholestin as a dietary supplement over two years ago, in November, 1996.

Pharmanex produces the red yeast rice using a modern, standardized version of the traditional Chinese production method. Be-cause it consists of red yeast rice, Cholestin, like most other dietary supplements and unlike drugs, has nutritive value. Cholestin is intended for use, along with diet and exercise, in helping maintain a healthy cholesterol level. FDA has not raised any issue as to the safety of Cholestin or as to its effectiveness for helping maintain a healthful cholesterol level.

Cholestin contains a range of HMG–CoA reductase inhibitors, which act to reduce serum cholesterol levels in humans by inhibiting HMG–CoA reductase, a naturally-occurring enzyme necessary for the formation of cholesterol in the human body. HMG–CoA reductase inhibitors constitute 0.4% of Cholestin. There are at least ten HMG–CoA reductase inhibitor constituents in Cholestin, including mevinolin, a natural substance that FDA has determined is chemically indistinguishable from lovastatin, a pure, crystallized, and synthesized substance, which is the active ingredient in the prescription drug Mevacor, marketed by Merck & Co., Inc.

FDA approved Mevacor as a new drug in 1987. Mevacor is indicated for treatment of hypercholesterolemia (elevated blood serum cholesterol and triglyceride levels), atherosclerotic disease, and coronary heart disease.

In this sense, Cholestin is like L-carnitine and caffeine—Cholestin's natural component, mevinolin, is also the active ingredient in a drug product (or, more precisely, equivalent to the active ingredient in a drug product) that has been approved by FDA for a particular prescription-only usage.[3]

### 3. FDA's Determination Regarding Cholestin.

At a meeting on April 7, 1997, FDA informally advised Pharmanex that it considered Cholestin a drug, which could not be marketed without FDA approval. While discussions between Pharmanex and FDA were ongoing, FDA issued a Notice of Detention and Hearing that prevented importation of a shipment of red yeast rice for encapsulation into Cholestin. Eventually, FDA issued the decision at issue in this case, establishing with admin-

---

**3.** To simplify, this Order hereafter uses the term "lovastatin" both when referring to the synthetic active ingredient in Mevacor and when referring to mevinolin, the natural constituent of Cholestin.

istrative finality FDA's position that Cholestin has the regulatory status of a drug.

As discussed in more detail below, FDA held that Cholestin is a drug, and not a dietary supplement, on the ground that mevinolin is chemically identical to lovastatin. As interpreted by FDA, the word "article" as used in the phrase "article approved as a new drug under section 355" in § 321(ff)(3)(B) can refer to either a finished drug product or any of that drug product's individual components, depending on the particular circumstances surrounding the ·manufacture and marketing of the dietary supplement at issue. *FDA Decision, at 5 and 10.* FDA reached its conclusion that lovastatin is the relevant article with respect to Cholestin based on its factual finding that Pharmanex manufactures and markets Cholestin in a manner that emphasizes that constituent.

### STANDARD OF REVIEW

The standard of review to be applied by a federal court in reviewing the actions of an executive agency under the APA depends upon the nature of the agency decision at issue. To the extent review depends upon an agency's interpretation of a statute administered by the agency, review is governed by the two-step process outlined in *Chevron U.S.A. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).* To the extent review depends upon an agency's factual determinations or mixed factual and legal determinations, review is governed by the "arbitrary and capricious" standard elucidated in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).* FDA's action involves both. FDA first interpreted 21 U.S.C. § 321(ff)(3) and then applied that interpretation to its factual findings regarding the manner in which Pharmanex manufacturers and markets Cholestin.

1. Review of an Agency's Interpretation of a Statute.

The analytical framework to be utilized by a reviewing court in assessing the legality of an agency's statutory interpretation involves two steps:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, 467 U.S. at 842–43, 104 S.Ct. 2778 (internal footnotes and citation omitted).*

■ A reviewing court does not move to the second step of the analysis merely because a statute is susceptible to different interpretations, that is, merely because of initial verbal ambiguity or uncertainty as to whether the statute answers the question presented. A court must first determine whether the statutory text Congress enacted, when read with the aid of traditional tools of statutory construction, objectively reflects a clear intent on the question at issue—that is, whether, with those tools, the text can properly be interpreted to provide a clear answer to the question presented.

These tools include "not merely text and legislative history, but also, quite specifically, the consideration of policy consequences." *Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 515.* "Only when the court concludes that the policy furthered by *neither* textually possible interpretation will be clearly "better" (in the sense of achieving what Congress apparently wished to achieve) will it, pursuant to *Chevron,* yield to the agency's choice." *Id. (emphasis in original).*

2. Findings of Fact.

■ On issues of fact that go to the merits, the record is limited to the administrative record compiled by FDA. *Nickol v. United States, 501 F.2d 1389, 1390 (10th Cir.1974).* For its factual findings to pass muster under the "arbitrary and capricious" standard, "the agency must examine the relevant data and articulate a satisfactory expla-

nation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S.Ct. 2856 (internal quotation marks and citation omitted).* In this regard, it is important to remember that, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id. at 50, 103 S.Ct. 2856.* Courts may not accept post hoc rationalizations advanced by agency counsel in the course of litigation. *Id.*

## DISCUSSION

1. FDA's Interpretation of the FDCA.

Although the relevant legal and factual materials are complex, the ultimate merits of this case depend on one basic issue: whether Cholestin is a "dietary supplement" as defined by FDCA in *21 U.S.C. § 321(ff).* This issue turns on whether Cholestin is subject to the clause in *§ 321(ff)(3)(B),* which excludes from the definition "an article that is approved as a new drug" under *21 U.S.C. § 355.*

Under FDA's interpretation of *§ 321(ff)(3)(B),* a component of a purported dietary supplement may be "an article that is approved as a new drug under section 355" any time FDA determines that the manufacturer, in manufacturing or marketing the purported dietary supplement, intends to market and manufacture that component. To reach the conclusion that a component of Cholestin is an article approved as a new drug, FDA had to define the relevant "article approved as a new drug" both with respect to Mevacor and with respect to Cholestin.

With respect to Mevacor, FDA has never justified its determination to treat lovastatin as the relevant article approved as a new drug, as opposed to Mevacor itself or any of Mevacor's other ingredients. Apparently, FDA determined that lovastatin is the relevant article based on lovastatin's status as the active ingredient in Mevacor.

With respect to Cholestin, FDA determined that lovastatin is the relevant article approved as a new drug based on its finding that Pharmanex is marketing lovastatin in marketing Cholestin, which finding is based in turn on FDA's findings that Pharmanex manufactures Cholestin in a manner de-signed to ensure that the product contains significant amounts of lovastatin and that Pharmanex promotes Cholestin for its lovastatin content.

Together, the major premises in FDA's line of reasoning flow as follows: (i) lovastatin is an article that was approved as a new drug in 1987, (ii) Cholestin is manufactured and marketed with a sufficiently great emphasis on its lovastatin content that Cholestin is to be equated with lovastatin, and (iii), therefore, Cholestin is excluded from the category of dietary supplements because it was not marketed as a dietary supplement or food before 1987, when lovastatin was approved.

2. Subjecting FDA's Statutory Interpretation to Analysis under *Chevron* Step One.

FDA asserts that *§ 321(ff)(3)(B)* is unambiguous and that its interpretation is compelled by the language of the clause itself. FDA asserts that as used in the FDCA, the term "article" includes both a finished product and its components. FDA points out that wherever the term "article" is used in the FDCA, it is defined to mean both a finished product and its components. Food, for example, is defined to mean "articles used for food or drink" and "articles used for components of any such article." *21 U.S.C. § 321(f).* Drug, for another example, is defined to mean articles that are recognized in the official United States Pharmacopoeia, articles that are intended for use in the prevention and treatment of disease, articles that are intended to affect the structure or function of the body, and "articles intended for use as a component of any article specified." *21 U.S.C. § 321(g).* Accordingly, FDA concludes that the term "article approved as a new drug" may refer to a finished drug product like Mevacor or a component of a finished drug product like lovastatin.

Pharmanex similarly asserts that the clause is not ambiguous, but does so on the ground that the dispositive term is not "article," but rather "article that is approved as a new drug under section 355," and that the only kind of "article" that is "approved as a new drug" is a finished drug product. Under

this interpretation, § 321(ff)(B) cannot apply to either lovastatin or Cholestin because neither has ever been approved as a finished drug product.

■ In support of its position, Pharmanex cites various FDA regulations,[4] Supreme Court decisions,[5] lower court decisions,[6] and a recent FDA administrative decision [7] showing that the only articles approved under § 355 are finished drug products, not active or inactive ingredients of finished drug products. These authorities sustain Pharmanex's position both because they show that FDA has consistently fought to advance it and because this Court must assume that Congress acted with knowledge of such pre-existing authorities. *See, e.g., Rodriguez v. United States, 480 U.S. 522, 525, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (rejecting interpretation of statute at odds with established judicial interpretation on ground that Congress is presumed to act with "full awareness" of such judicial interpretations); Lorillard v. Pons, 434 U.S. 575, 580–81, 584–85, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Nor can we believe that in using the word "legal," Congress was oblivious to its long-established meaning or its significance.").*

As further evidence that only finished drug products are approved as new drugs, Pharmanex cites the definition of "new drug" under the FDCA, pursuant to which a "new drug" means:

(1) Any drug ... the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof ...;or

(2) Any drug ... the composition of which is such that such drug, as a result of investigations to determine the safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

*21 U.S.C. § 321(p).* As Pharmanex notes, only a drug product has a composition (that is, a combination of ingredients),[8] can have labeling, be in investigations, or be used under conditions set forth in the labeling. A component of a drug product cannot.

FDA's only response is to assert that if Congress had intended "article that is approved as a new drug under section 355" to refer to a finished drug product, Congress could have used the term "product" instead of "article." More specifically, FDA argues that because § 355(ff)'s two inclusionary clauses use the term "product" in defining dietary supplements, to read the term "article" as used in the exclusionary clause to also mean "product" is to interpret different language in statutory subsections as having the same meaning in each—an action inconsistent with sound principles of statutory construction. *See, e.g., Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("We refrain from con-*

---

4. *21 C.F.R §§ 314.50(d)(1)(ii)(a), 314.105(a), and 314.107(a) (1997).*

5. *United States v. Generix Drug Corp., 460 U.S. 453, 459, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983) ("The term 'drug' is plainly intended throughout the Act to include entire drug products, complete with active and inactive ingredients."); USV Pharmaceutical Corp. v. Weinberger, 412 U.S. 655, 664, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973) ("Section [355], in other words, addresses itself to drugs as individual products.").*

6. *See, e.g., Pfizer, Inc. v. FDA, 753 F.Supp. 171, 171 (D.Md.1990) ("The FDA interprets the word 'drug' as used in [§§ 355(b)(1) and (c)(2)] to mean the 'drug product' for which the new drug application was filed. Pfizer contends that the term 'drug' in this context refers to both the drug substance (active ingredient) and the drug product.... [Pfizer's] argument is without merit.")*

7. *Decision of the Food & Drug Administrator's Director of the Center for Drug Evaluation & Research, Docket No. 98P–0547/CP1 & SUP1 (Dec. 4, 1998) ("Both the statutory language and the [abbreviated new drug application] approval structure established by the [FDCA] support FDA's interpretation of the term drug in 21 U.S.C. § 355(j) as meaning drug product.").*

8. FDA argues that "composition" in § 321(p) is undefined and, therefore, must have the dictionary meaning of "a combination of parts or elements to form a whole." FDA then contends that any chemical has its own molecular structure and, thus, its own composition. This interpretation of the term "composition" reads the term out of § 321(p) and, therefore, is without merit.

*cluding here that the differing language in the two subsections has the same meaning in each.").*

However, the inclusionary clauses arise in a different context and perform a different function than the exclusionary clause. The inclusionary clauses set forward a definition of dietary supplements, which had not previously been defined, and, in doing so, fulfill one of DSHEA's fundamental purposes, namely, to define dietary supplements in order to establish a rational federal regulatory framework governing their use. *Pub.L. No. 103–417(2)(15)(B), 108 Stat. 4326 (1994), 21 U.S.C. § 321 note.* Under the structure of these clauses, a dietary supplement "means a product" with certain listed characteristics.

As the Senate Report explains, the exclusionary clause was added to deal with a discrete concern, namely, that manufacturers or importers of drugs would be able to avoid the drug approval process by marketing drugs as dietary supplements. *S.Rep. No. 103–410, at 20 (1994).* In addressing this concern, Congress was not writing on a blank slate as it was in defining dietary supplements. Use of the term "article approved as a new drug under section 355" is consistent with a Congressional intent to refer to a previously-defined subject matter, namely, drugs. Use of the word "article" presumably reflects its use in the definition of "drug" in § 321(g)(1).

Under these circumstances, the fact that Congress did not use the same term in both is not significant. Where circumstances warrant, as they do here, courts may interpret different statutory terms as having the same meaning. *See, e.g., Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 480, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (holding plain meaning of statute "cannot be altered by the use of a somewhat different term in another part of the statute").*

The existence of a pervasive body of regulatory and judicial authority either directly (by explicitly holding that § 355 approval extends only to finished drug products) or indirectly (by using the terms at issue in contexts in which they cannot possibly bear the meaning placed on them by FDA) estab-

lishing that "article approved as a new drug" refers only to finished drug products demonstrates that *§ 321(ff)(B)* cannot sustain the interpretation advanced by FDA. In other words, given the pervasive body of authority establishing that "article approved as a new drug under section 355" refers to finished drug products, the fact that Congress used that language reflects a clear and unambiguous Congressional intent to refer to finished drug products. Neither FDA nor this Court is free to ignore that intention.

Indeed, FDA's failure to consider its own longstanding prior interpretation of the scope of approval under *§ 355* and to explain why that interpretation does not apply here is, by itself, sufficient ground to hold FDA's decision invalid. *See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 57, 103 S.Ct. 2856 (vacating agency action under APA on ground that "an agency changing its course must supply a reasoned analysis"), and King Broad. Co. v. FCC, 860 F.2d 465, 469–70 (D.C.Cir.1988); see also Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 135, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (holding agency has no authority to depart from longstanding judicial interpretations).*

3. Subjecting FDA's Statutory Interpretation to Analysis under *Chevron* Step Two.

Responding to Pharmanex's argument that this case can be resolved at *Chevron* step one, FDA asserts at times that to accept Pharmanex's interpretation this Court must hold that Congress has directly spoken to the central issue in this case by unambiguously stating that dietary supplements may contain active ingredients of approved drug products. The ambiguity this Court must find at *Chevron* step one in order to move to *Chevron* step two, however, does not necessarily concern the overarching issues that may be raised by a lawsuit. The ambiguity this Court must find at *Chevron* step one concerns the meaning of the statutory language under examination. If the meaning of that language is unambiguous, the fact that it does not provide an answer to some larger question does not warrant a shift to *Chevron* step two.[9] That is to say, the fact that

9. At any rate, *§ 321(ff)(3)* does address the circumstances when a product will be excluded

from the definition of dietary supplement be-

§ 321(ff)(3)(B) cannot be used to achieve the result desired by FDA does not by itself warrant deference to a proposed interpretation that could be so used.

### CONCLUSION

1. Under the plain language of *21 U.S.C. § 321(ff)(1)*, Plaintiff's Cholestin product is "a product (other than tobacco) intended to supplement the diet." Within the meaning of *21 U.S.C. § 321(ff)(2)*, Cholestin is intended for ingestion in a capsule, a form described in *21 U.S.C. § 350(c)(1)(B)(i)*. Accordingly, Cholestin fits within the definition of "dietary supplement" in *21 U.S.C. § 321(ff)(1) and (2)*.

2. Plaintiff's Cholestin product is not excluded from the category of "dietary supplements" by *21 U.S.C. § 321(ff)(3)*. Under *21 U.S.C. § 321(ff)(3)(B)(i)*, the category of dietary supplements "does not include ... an article that is approved as a new drug under section 355 ... which was not before such approval ... marketed as a dietary supplement or as a food...." Thus, *21 U.S.C. § 321(ff)(B)* applies only to "an article that is approved as a new drug." Cholestin is not such an article.

3. FOR THE ABOVE–STATED REASONS, THE COURT HEREBY GRANTS PLAINTIFF'S MOTION, PURSUANT TO *5 U.S.C. § 706(2)*, TO SET ASIDE AND HOLD UNLAWFUL FDA'S DECISION OF MAY 20,1998.[10] Each side shall bear its own costs.

---

cause of the relationship between it or its ingredients and an approved drug product.

10. Accepting as true the representations of FDA counsel made before this Court at oral argument

that FDA will comply in good-faith with any order issued by this Court, this Court does not grant the further relief requested by Pharmanex.